**EMPLOYERS' LIABILITY ASSUR. CORPORATION, LIMITED, OF LONDON, ENGLAND, v. C. E. CARNES & CO., Inc., et al.**

**No. 749.**

District Court, W. D. Louisiana, Lake Charles Division.

May 27, 1938.

Edward Rightor and W. H. Sellers, both of New Orleans, La., for complainants.

Hawthorn, Stafford & Pitts, of Alexandria, La., McCoy, King & Jones and R. A. Anderson, all of Lake Charles, La., H. P. Carmouche, of Crowley, La., R. H. Agate, Jr., of Welsh, La., and N. C. Pettijean, of Rayne, La., for respondents.

DAWKINS, District Judge.

Plaintiff brought this suit for a declaratory judgment against its assured, C. E. Carnes & Company, Inc., under a policy of public liability insurance, and against numerous other persons, who were injured or had their property damaged by an explosion of butane gas hauled by the truck covered by the policy. It alleged that a controversy had arisen as to its duty to defend claims against the assured resulting from said explosion exceeding many times the face of the policy and prayed for a judgment declaring its "rights, obligations and other legal relations * * * under its policy," both as to the insured and other persons who had suffered injuries or damages from said explosion.

All of the defendants have contested the position taken by plaintiff and assert its liability to the full extent of the policy. They also seek in the alternative, if the policy is held not to cover the particular accident, to have it reformed to that end, because of certain allegations as to knowledge, representations, etc. of plaintiff's agents.

I find the facts as follows:

Plaintiff is an insurance company, domiciled in London, England, and issued its policy of public liability insurance to and in favor of C. E. Carnes & Company, of Crowley, Louisiana, on August 18, 1935, covering a certain one and one-half ton Dodge truck, 1934 model, bearing serial number 8354967 and motor number T–6–6307, upon an application filled out by the local agent on information furnished by the insured, which stated that its occupation was that of "handling farm machinery, Crane fixtures and paints", and that the truck was for "commercial use (hauling merchandise for assured's business only)". The policy, as issued, carried the same statements as to the business of the assured and the purpose for which the truck was to be used.

With respect to the liability of the insurer for personal and property damage, the policy provides:

"Coverage A—Bodily Injury Liability.

"To pay on behalf of the assured all sums which the Assured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the ownership, maintenance or use of the automobile.

"Coverage B—Property Damage Liability.

"To pay on behalf of the assured all sums which the Assured shall become obligated to pay by reason of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the ownership, maintenance or use of the automobile."

It also defines the term "commercial" as follows:

"2. Purposes of use defined * * *. (b) The term 'commercial' is defined as the transportation or delivery of goods, merchandise or other materials, and uses incidental thereto, in direct connection with the named assured's business occupation, as expressed in item 1. (c) Use of the automobile for the purposes stated includes the loading and unloading thereof."

Paragraphs 10 and 13 of "Conditions" of the policy are quoted as pertinent to the decision of this case as follows:

"Declarations. By acceptance of this policy the named Assured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this policy embodies all agreements existing between himself and the Corporation or any of its agents relating to this insurance."

"Financial Responsibility Laws. Coverages A and B

"Any insurance provided by this policy for bodily injury liability or property damage liability shall conform to the provisions of the motor vehicle financial responsibility law of any state or province which shall be applicable with respect to any such liability arising from the use of the automobile during the policy period, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The Assured agrees to reimburse the Corporation, for any payment made by the Corporation on account of any accident, claim or suit, involving a breach of the terms of this policy and for any payment the Corporation' would not have been obligated to make under the provisions of this policy except for the agreement contained in this paragraph."

The policy was renewed in identical form on August 18, 1936, and was in effect when the circumstances out of which this litigation arises happened on October 21, 1936.

At the time of the issuance of the first policy, the insured, Carnes & Company, was engaged in the business of handling "farm equipment, such as tractors and machinery, Crane plumbing fixtures, pipe and general hardware line of the Crane type. We handle a marine line of hardware and belting * * * paint, turpentine, oil and cans of various stuff of that kind." Crane fixtures which it handled, consisted of "automatic water plants, operating under electricity for country homes; Crane bath equipment for bathrooms; kitchen sinks, and pipe, and all types of roughing-in material; valves, which we carried in stock to sell to different mills and other concerns in the country;

some Crane tools that we sold to plumbers, and pipe fittings and things of that kind."

The Carnes Company first began handling butane gas several months after the original policy was issued. At first, it simply sold the tanks in which the gas would be stored, heaters for its use, etc., which the insured installed in homes; and in the beginning butane gas was furnished by "another concern who came and put the liquid in the containers after we had them installed."

Defendant did not handle the liquid until "about the first of 1936." According to C. E. Carnes, one of the officers of the assured, "95% of butane gas is used by refineries for fuel. Then it is used by a good many concerns in place of acetylene gas. A good deal of it is used in the repair and manufacture of refrigerators, but within the last two or three years, there has been built up in Louisiana a considerable consumption of it as fuel for homes, for heating and for automatic refrigeration and cook stoves; for automatic hot water heaters and things of that kind."

Its use "is confined to the rural sections that do not have natural gas" or in "towns where natural gas lines have not been extended." The Crane Company furnished and the defendant installed hot water tanks "altered at the factory to be suitable for burning butane gas."

The tank which was being used for hauling butane gas at the time of the explosion, was sold to Carnes & Company by the Crane Company, who had it shipped from Pekin, Illinois, after it had been made "adaptable to use on a truck. * * * The tank is different from those placed in the ground or used for other purposes."

The agent of the insurance company who represented it in Crowley, where the accident happened, at one time, had his office in the place of business of the insured, but later moved into another room of the same building with only an archway separating them. He did not write any casualty business but the policies were always prepared in New Orleans, on information which he furnished, usually in the form of an application which he filled out. He swears that he did not require anyone in behalf of the present insured to detail phases of its business, because he "knew enough about it" himself; and he also swears that at the time "the new policy was written" he knew insured "had been handling butane gas" and that the truck covered "was equipped with a butane gas tank being used to transport butane gas." The tank was kept on a platform at the insured's place of business when not being used to haul butane gas. This agent also testified that he had, about the time the insured began handling butane gas, discussed it with one of the officers of that company, who "had become a little bit uneasy about different accidents * * * and wanted to be sure he was fully protected,—that they were, the corporation, —rather, against claims from outsiders in case of injury or accident, either from the trucks or the operations in any way of butane gas." He also testified that the truck had a sign on it, "in box-car letters" and was frequently parked outside of his office, where it could be seen by the special agent of the plaintiff, who visited the witness' office once every thirty days. The officers of the insured had owned an interest in the insurance business of White, the plaintiff's agent, but this had been sold to him on terms of credit, and according to Carnes, one of the officers of the defendant company, the notes had been paid a year or two before the explosion.

Defendant Carnes & Company was the first to begin handling butane gas in its trade territory, a little less than a year prior to the accident. The tank in which it was hauled had been specially constructed by Murphy & Wall, of Pekin, Illinois, at the request of the Crane Company, through whom it had been ordered by Carnes & Company, and as previously stated, was placed upon the truck when the butane gas was to be hauled, and removed when the truck was used for other purposes. The insured had a filling station or tank for its own use, but did not sell to the public. No attendant was kept there and it was at this station that the explosion occurred. The tanks sold for use of the butane gas were not fitted for installation when received by Carnes & Company, but the insured would obtain the pipes, fittings, etc. from other places, assemble the whole, and install them for their customers.

Dall Thomas, the special agent of plaintiff, denied that he discussed with White, the local agent and Bone, an officer of the insured, the handling of butane gas or that he knew it was so handled. He

132

produced a memorandum made at the time, on which no mention is made of the gas. On the other hand, White swore the gas was discussed and Thomas gave them to understand that the truck would be covered by the policy while handling it.

H. Bone, a former vice-president of the insured, but who was not connected with it at the time of the trial, also testified that in December, 1935, after the issuance of the first policy, he had, with White, the agent, discussed with Thomas, plaintiff's special agent, the general coverage of the assured's business. He says:

" * * * The matter under discussion was our liability in connection with the installation of this gas,—the delivery of tractors and heavy engines on trucks; also our liability in connection with the equipment of commercial salesmen. In other words, I was trying to cover the whole picture in which the gas was included along with the rest."

The fact that his company was a dealer in butane gas was discussed; and further, when asked if there was a reason for discussing the coverage and liability with Thomas, replied: "Yes, with the several accidents that had occurred to us in our business. Not in the business of C. E. Carnes but some other operations Carnes and I were carrying on, and also an accident that a short while before had happened at Eunice in connection with the handling of a tractor. It was all of these items that I was going over with Thomas." He further testified that White had seen the truck used for hauling the butane gas, but when asked if Thomas knew it, replied:—"Well, I could not say that." Further on he was asked the question and replied thereto as follows:

"Q. Now, were you discussing the general coverage of your company because of the handling of this butane gas? A. No; I can't say that. I was discussing the general coverage, including the butane gas."

He did not know whether any change was made in the insurance coverage because of the gas, and when again pressed by counsel for the insured, testified as follows:

"Q. Was the handling of butane gas thoroughly discussed in the conversation? A. Well, no.

"Q. Well, was it discussed? A. Yes.

"Q. What was your purpose? A. I was discussing the whole of our affairs. I was not stressing butane gas any more than the risks inherent in loading a tractor or truck and everything, such as might tip over and kill a man. I was referring to extending our mechanics out into the country to install this butane equipment and the risk of placing stuff like that.

"Q. Now, did you discuss the risk of explosions? A. Oh yes, but you asked me the question if the discussion came up on account of butane gas. I want to make myself clear.

"Q. You wanted to protect the company? A. As a whole, yes.

"Q. Explosions had occurred prior to that time? A. Yes.

"Q. Were those explosions discussed? Were they mentioned? A. There had been no explosions of butane gas. There had been accidents with tractors."

He nowhere says that Thomas either knew of the change or assured him that the truck would be covered while hauling butane gas.

This is in contrast to the statement of White, the agent who carried all of the insurance of Carnes & Company, and who testified:

"Q. Did that conversation bring out to Mr. Thomas the fact that butane gas was being used? A. Absolutely.

"Q. Would Mr. Thomas, on the occasion of his visits to Crowley, pass by C. E. Carnes & Company's place, in a manner which would reveal to him the truck containing butane gas of the assured here? A. Yes."

He likewise testified that no change was made in the policy as a result of this conversation. Finally he was asked and answered questions by the insured's counsel, as follows:

"Q. Mr. White, I will ask you whether or not at the time of the issuance of the policy in August, 1936, if it was Carnes & Company's intention and your intention, to cover that truck in its operations for hauling butane gas, as well as for any other operation in which it might be needed? A. For any and all of its operations.

"Q. Including handling butane gas? A. Yes sir."

Earlier, in his direct testimony, he was asked if he recalled the conversation here-

tofore mentioned between Thomas, Bone and himself, "in November or December, 1935", and answered in the affirmative. The invoice for the tank, which was used on the truck, is dated December 16, 1935, and the agent of Crane & Company, Mr. Lagarde, says, "It was probably delivered in the beginning of 1936". It is described in the invoice as "one 940 gallon 58 x 120 galv. inside and out storage tank, with tappings as per sketch. Tank for use with liquid butane gas system." It was not manufactured by Crane, but they obtained it for the insured from one of their regular "sources of supply", Murphy & Wals, of Pekin, Illinois, who made the alterations therein according to the directions of Carnes & Company. The sales manager of the Crane Company, through whom this tank was sold to the insured, testified that tanks are not classified as "plumbing fixtures" in the plumbing business, and this particular type of tank was the kind ordinarily used as a pneumatic storage tank, with pressure pump system for water. His company does not sell tanks to other distributors of butane gas.

Dall Thomas testified that he was "special agent" for the plaintiff, which position he had held for about six years, and prior to that time had been "claim adjuster"; that his duties as special agent were "to go out and make agency connections and collect balances and solicit business with the agent"; that inspections are made by the engineering department; that "back in 1935, Mr. Bone, Guy White and myself discussed the coverage of some tractors and machinery"; that they did not discuss butane gas and at that time he did not know what it was; and that he made a memorandum contemporaneously with the conversation, which included "the pay-roll of the various employees. I took it to New Orleans to discuss with the underwriters as a coverage concerning this particular risk." He produced, as a witness, what he said was this memorandum, and which reads as follows:

"C. E. Carnes & Co., Inc.
Manufacturing agents.

Selling Gas Engines Pumps, Motors, Light plant (light
                        home service)
Battery (Fairbanks-Morse Co.)
        (small stuff)

Crane & Company.
Plumbing Equipment.

| | |
|---|---|
| Salesman | $6,000.00 |
| Labor 3724 | $2,000.00 |
| Clerical $2,000.00" | |

On the back thereof appears the following:

"3724        —        $1750.00.

Adolph Gold
C. E. Carnes.

Porter and General."

On direct examination he interpreted this memorandum as follows:—"Manufacturer's agent selling gas engines; pumps, motors, light plants and motors manufactured by Fairbanks-Morse and plumbing equipment manufactured by Crane & Company." He then testified that this represented the "character of risk" that his employers "were underwriting" and it was for the purpose of issuing "manufacturers' and contractors' liability policies."; that he never inspected risks for the company, except by special instructions, including motor vehicles; that he didn't deny the assured was selling and advertising for sale butane gas at that time, but if so, he didn't know it; and that there was no change made in the coverage after this conversation. Further, that local agents do, in some instances, write policies like the one in question, and it is done in Lake Charles; the inspections of individual trucks are made by the local agents, and the engineers are only sent out to inspect fleets of trucks.

My view is' that the burden of proving that Thomas or anyone else claimed to represent the insurer had knowledge of conditions that would estop it from contending the truck was not covered when hauling butane gas, was upon the defendants, and the evidence does not establish that knowledge in Thomas.

From a careful consideration of all this evidence, it does not seem reasonable to conclude that there was a discussion of the hauling of butane gas by this truck at the time of the interview between Thomas, White and Bone in November and December, 1935, as ordinarily, invoices are issued and received by purchasers long before the goods arrive, especially of this kind, such as a tank, which weighed 1390 pounds. The invoice contains the

notation that it was shipped "via freight, —Pekin, Illinois, 12/13". The record does not show exactly when the tank arrived in Crowley, but I think Mr. Legarde, division manager for Crane & Company, was substantially correct when he said it probably was delivered in January, 1936. The former vice-president of the assured, Mr. Bone, does not corroborate White in the flat statement that the hauling of butane gas by this truck was discussed, although the gas was mentioned in a general way, and my conclusion is that White, to say the least, was mistaken and Thomas is correct in the statement that he did not know the truck was being used for that purpose. It is true, as Carnes testified, that the insured had been installing tanks for use of the gas which was furnished and delivered by other persons, and doubtless both Bone and White knew it, but this is a different thing from the actual hauling and delivering of the gas itself by the assured in the truck in question.

The witness Herman Egloff, called on behalf of the plaintiff, testified that he was manager of the Gulf Department of the plaintiff and that this company would not have issued the policy if it had known the truck was to be used in hauling butane gas; that his company had had applications for insurance on trucks hauling said gas, but they refused and it would not write such insurance at any price. He admitted his company sometimes issues policies on trucks which haul gasoline, but would not do so as to dynamite and similar explosives. There is nothing to dispute this statement and when the nature of butane gas is considered, I cannot doubt that this statement is correct. It boils or evaporates at one degree above zero Fahrenheit, which, of course, means that the liquid becomes a gas as soon as the pressure is released and it comes in contact with the atmosphere. It is heavier than air and has a tendency to cling close to the earth; whereas, gasoline has a much higher vaporizing point. One might be perfectly willing to insure a truck hauling the latter and not the former.

Accepting, however, the statement of the local agent, White, that he knew the insured was hauling this gas on the truck in question, would this make the defendant liable in view of the provisions of the policy and all the other evidence in the case? If not, does the evidence, as a matter of law, establish an estoppel or warrant the court's reforming the policy so as to include this liability?

The first policy, or one for the year beginning August 18, 1935, was issued several months before the insured started handling butane gas. White, the agent, swears he learned immediately that it was being so handled, but he does not say, and there is no other evidence to show that this fact was ever made known to the district office of the plaintiff in New Orleans, where the policy was actually issued (except the claim that Thomas, the special agent, was informed of it on his visit to Crowley in November or December, 1935, and which I have found was not true). The second policy was issued effective August 18, 1936, as the result of a letter from Egloff, written to White at Crowley, June 16, 1936, in which it was said:

"The below listed policies will expire as indicated. Kindly make a note beside each expiration as to whether or not renewal is desired, also whether change is necessary in the name of the assured, address, the property covered.

"Perhaps you can increase the limits on the liability policies and obtain additional coverages:

Assured:          Policy No.      Remarks.

. . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . .

18th. C. E. Carnes & Co., Inc. SF–266361.

"We are sending this notice with a view of rendering a more efficient service and saving expense in issuing policies which are not wanted and we trust you will cooperate with us by mailing this notice back promptly.

. . . . . . . . . . . . . . . . . . . ."

In the space between the name of Carnes & Company, Inc., and the last quoted paragraph, White inserted the following:

"This is to advise that it will be in order to issue the above renewal.

"Guy L. White Ins. Co., Inc.

"By  Guy L. White."

This was stamped: "Received June 20, 1936. Gulf Und. Dep."

As previously stated, this new policy contained the identical statement as to the nature of the insured's business and the purposes for which the truck was to be used, as the former one.

█ The provisions of the policy quoted above in the findings of fact, as to the nature of the insured's business and purposes for which the truck was to be used, on the face of the contract, do not appear to cover the risk of handling a dangerous and explosive substance, such as butane gas, which evaporates at the low temperature of one degree above zero Fahrenheit, and has the other characteristics above stated. This is what is known as liability insurance, which has been defined as follows:

"Liability ·insurance is that form of insurance by which an insured is indemnified against loss or liability on account of bodily injuries sustained by others, or in a broader sense, against loss or liability on account of injuries to property." C. J. Vol. 36, p. 1056, Sec. 1.

It is of recent origin, when compared to fire insurance, and was unknown in this country prior to 1887, when it was introduced from England. Ib. Sec. 2.

█ Generally speaking, "a policy of liability insurance covers any and all liabilities or losses for which insured is lawfully liable, that it is apparent were within the intention of the parties, as expressed in the terms of the policy, and is construed by the general rules of construction, and it cannot be extended to liabilities or losses which are neither expressly nor impliedly within its terms." Ib. p. 1079, Sec. 51.

The contract declares that "in consideration of the payment of the premium and of the statements contained in the declarations and subject to the limits of liability, exclusions, conditions, and other terms of this policy", the insurer will pay on behalf of insured "all sums" (within its limits as to amounts) for which liability is "imposed upon him by law" for damages, to persons or property, as stated in paragraphs A and B of Section I, quoted above. The declarations, of course, include the declared nature of the insured's business and the purposes for which the truck was to be used as quoted in the above findings of fact, and these did not include the hauling. of butane gas or substances of similar character.

█ It is conceded that information as to the nature of the business of assured was furnished by White, and when he took upon himself the responsibility of so furnishing it for plaintiff's use in determining whether to accept the risk, he was placed in the dual position of acting in part at least on behalf of the latter, as well as the former. That information as written into the policy at that time was correct. When the policy was received by Carnes & Company, it was charged with knowledge of the character of those statements, as well as with the limitations upon White's powers to enlarge or extend them verbally. So I think the contract on its face must be held not to include liability for damages caused in the hauling of butane gas. As has been previously pointed out, Carnes & Company were not selling and delivering it in the truck in question or by any other means when White furnished this information, and there was no misstatement on his part of the facts in the application he filled out for the insured. When the policy came to be renewed, the conditions had changed and it was being so handled, and according to White, this was known to him, but he said nothing to plaintiff about it, by letter or otherwise. When the new policy was issued, there was no change in the declarations as to the nature of the business and when it was received, defendant, insured, was again charged with knowledge of its provisions. As I have said, there could have been no liability had the accident happened while the first policy. was in force, because the change was made, in that the handling of butane gas commenced several months thereafter, even under the case of Bible v. John Hancock Mut. Life Insurance Company, 256 N.Y. 458, 176 N.E. 838, one of the principal cases relied on by defendant. Plaintiff was also bound to know that the renewal, effective August 18, 1936, was of the same tenor. Can the fact that there was a violation of its terms, in a manner which would have relieved the insurer, after the issuance of the first policy, to the knowledge of the local agent, serve to fasten liability upon the plaintiff when the same contract came up for renewal and was renewed in identical form? The truck evidently was used for other purposes, and even as to the first policy, the insurer was responsible for any damage for which the insured might have become liable within the intendment of the policy during that time other than the hauling of butane gas, so that there was ample consideration for the premium which was paid.

136

In the policy itself it is specifically stipulated:

·"7. Changes. No notice to any agent, or knowledge possessed by an agent or by any other person, shall be held to affect a waiver or change in any part of this policy, nor estop the Corporation from asserting any rights under the terms of this policy; nor shall the terms of this policy be waived or changed except by indorsement isued to form a part hereof, signed by the manager and attorney of the Corporation for the United States; provided, however, that changes may be made in the written portion of the declaration by indorsement issued to form a part hereof, signed by the agent signing this policy."

In other words, regardless of what White may have said, the insured was bound to know that by express terms of the policy, its provisions could not be enlarged, so as to include a liability not embraced therein, except by proper written indorsement thereon. In the absence of anything done by the company to mislead the insured, or conduct which would amount to a fraud upon its rights, this contract was the law between the parties and both are bound by it. Defendant could not rely upon the oral statements of White that it was covered while handling the gas in the face of this provision and any assertion to that effect by him was merely his personal opinion. See Northern Assur. Co. Ltd., v. Case, 4 Cir., 12 F.2d 551; Euto v. Lumberman's Mutual Casualty Co., 247 App.Div. 613, 288 N.Y.S. 232.

### Estoppel.

What has been said above also applies to the prayer for reformation of the contract. In order to reform a written contract, it is necessary that the party claiming such right shall either establish a clear understanding between both sides to make an agreement different to that which is written, or the understanding on the part of one to that effect as to which the conduct of the other, with full knowledge of such understanding, has been such as to mislead the former, to his prejudice in believing that the meaning contended for was correct. Under the situation as it exists here, because the insurer had no knowledge of such contended interpretation, but issued the second policy without knowledge that the change had taken place in the use of the truck after the first was issued, and therefore had no op-

portunity to object, it cannot be said to have done anything amounting to an estoppel. It does not matter that the local agent may have had such knowledge, for the insured was bound to know that this was not sufficient under the express terms of the policy, to bring home to his principal ·that the change in use of the truck had taken place between the issuance of the first and second policies.

Plaintiff should have judgment as prayed for.

Proper decree should be presented.